## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**PHYLLIS HARRIS**,

Plaintiff,

v.

**WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY**,

Defendant.

Case No. 20-cv-8 (CRC)

## <u>MEMORANDUM OPINION</u>

This case arises from tragic circumstances.  Plaintiff Phyllis Harris's son, Jamal Ferrell, was fatally stabbed last year at the underground entrance to the Potomac Avenue Metro Station in Southeast Washington, D.C.  She has now sued the Washington Metropolitan Area Transit Authority ("WMATA") for negligence, claiming WMATA could have prevented Mr. Ferrell's death had it acted reasonably to prevent the escalation of an argument on a WMATA bus prior to the stabbing, to ensure the Metro station was secure, and to provide medical assistance to Mr. Ferrell after the attack.  WMATA has moved to dismiss or for summary judgment.

WMATA will prevail on most of Ms. Harris's claims.  Some of those claims are barred by WMATA's sovereign immunity, which shields it from tort liability for actions and omissions in the course of performing its governmental functions.  Others fail because the undisputed facts show that, even if WMATA breached certain duties it owed to Mr. Ferrell, those breaches did not proximately cause Mr. Ferrell's death.  However, there are genuine disputes of material fact as to one issue: whether WMATA is liable for its station agent's alleged failure to provide emergency medical assistance to Mr. Ferrell after the attack.  The Court will therefore deny WMATA's motion with respect to that claim but grant it as to all the others.

## I.   Background

A.  Facts

The following facts are either undisputed or apparent from security camera footage provided by WMATA in support of its motion.[1]  On the night of April 28, 2019, Jamal Ferrell was traveling on a WMATA bus when he got into a verbal altercation with several other passengers.  Starting at 11:35 p.m.,[2] security footage shows Mr. Ferrell engaging with three other passengers on the bus: a woman, a man wearing light-colored pants (referred to in Ms. Harris's brief as "Male #1"); and a man wearing dark-colored pants ("Male #2").  Although the audio is difficult to hear, the conversation grows heated, and raised voices can be heard on the security video at 11:36.  Mr. Ferrell repeatedly asks, "What are you talking about?"  Mr. Ferrell then gets up from his seat and walks toward the front of the bus.  As Mr. Ferrell is moving away, Male #2 says something along the lines of, "You better keep on moving, shorty, if you don't want the shit kicked out of you, shorty.  I'll [inaudible] the shit out of his dumb ass."  Clearly agitated, Mr. Ferrell responds that he is "right here," then makes a remark that is difficult to hear.  The woman then turns toward Mr. Ferrell and tells him to "go home, sir, go home."  No physical fight occurs on the bus.

---

[1] See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (court should "view[] the facts in the light depicted by the videotape").  Because Plaintiff neglected to file a statement of material disputed facts, as required by Local Civil Rule 7(h)(1), the Court will also assume the facts identified by WMATA in its statement of material facts are admitted to the extent they are not controverted by the videos.  See Burke v. Gould, 286 F.3d 513, 518 (D.C. Cir. 2002) (district court does not abuse its discretion by treating the movant's statement of facts as conceded where the opposing party fails to file a counterstatement as required by local rule).

[2] WMATA submitted evidence that the timestamps on its security videos are reliably accurate.  Doody Decl. ¶ 10.  Ms. Harris has not contested the accuracy of the timestamps.  The Court will therefore accept as true that events shown on the security video occurred at the time indicated by the timestamp.

At 11:37, the woman and Male #2 leave the bus through the rear exit door.  A few seconds later, Mr. Ferrell asks the bus driver to let him off, and he exits through the front door. Male #1 follows Mr. Ferrell out the front door almost immediately.  From the video, it appears that the four passengers briefly engage with each other on the sidewalk.  At 11:37:40, Male #1 returns to the bus and says, "I'll put your dumb ass to sleep out here, shorty," or something similar.  The bus then pulls away.

Mr. Ferrell is next seen on camera at 11:40:38, when he arrives at the Potomac Avenue Metro Station, which is owned and operated by WMATA.  Security footage from the Metro station shows that all three of the station's escalators are operating.  The escalator on the left side of the screen leads down; the middle escalator and the one on the right lead up.

Almost as soon as Mr. Ferrell appears descending on the left escalator, a man— apparently Male #2—appears to kick him.  He tumbles to the bottom of the escalator.  Because the station is closed, the gates to the platform are down, and Mr. Ferrell cannot flee into the passenger area of the station.  A second camera positioned inside the station captures the fight that occurs at the bottom of the escalators.  Mr. Ferrell and his assailant exchange punches as he is backed against a wall.  The camera then records the assailant stabbing Mr. Ferrell several times, pushing him onto the up escalator on the right, and possibly stabbing him again.

At 11:41:18, another individual—possibly the woman from the bus—appears on the video and travels down the left escalator.  This person then travels up the middle escalator with the assailant.  Meanwhile, a visibly injured Mr. Ferrell rides the right escalator, prone but still moving.  About halfway up, he appears to stop moving and the escalator carries him off screen.

According to a declaration submitted by Metro Transit Police Department ("MTPD") Captain Stephen M. Boehm, MTPD received a radio call at "approximately 11:42 p.m." about "a

reported assault at Potomac Avenue Metro Station." Boehm Decl. ¶ 16. MTPD subsequently responded and found a man who fit Mr. Ferrell's description unresponsive and without a pulse at the top of the escalator. Id. The record does not reflect who called the police, what information the caller conveyed, or what time MTPD arrived at the station.

At 11:43:08, another person—apparently a WMATA station agent—appears on camera inside the Metro station. She walks toward the scene and looks around from inside the gate. The agent exits the frame, then returns about a minute later and takes a closer look. The video does not establish what the station agent heard or saw during the time when Mr. Ferrell was in the station. Nor is it apparent whether the station agent was able to see Mr. Ferrell from inside the gate when she inspected the scene, and if so, whether she took any actions to help him. Sadly, Mr. Ferrell died from his injuries.

B. Proceedings in this Case

Ms. Harris initially filed this action in District of Columbia Superior Court in December 2019, seeking damages for WMATA's alleged negligence under D.C.'s wrongful death and survival statutes. Compl., ECF No. 1-4. WMATA removed the case to this Court in January 2020, asserting jurisdiction under the WMATA Compact, the congressionally approved interstate compact that created WMATA. Notice of Removal 2 (citing D.C. Code § 9-1107.10).

WMATA soon moved to dismiss the complaint, arguing primarily that Ms. Harris's claims were barred by WMATA's sovereign immunity. Def.'s Mot. to Dismiss, ECF No. 7. Ms. Harris filed both an opposition brief and a motion to amend her complaint. The Court granted the motion to amend in February 2020. Among other changes, the amended complaint adds allegations that WMATA's actions violated its own Station Standard Operating Procedures ("SSOPs"). Am. Compl. ¶ 23.

After Ms. Harris amended her complaint, WMATA filed the present motion to dismiss or for summary judgment, attaching a statement of material facts, declarations from two witnesses, and security videos from the bus and Metro station recorded the night of April 28, 2019.  Def.'s Mot. to Dismiss or for Summ. J, ECF No. 13.  WMATA argues that Ms. Harris has failed to state a claim or, alternatively, that the undisputed facts establish WMATA's entitlement to judgment as a matter of law.  WMATA also continues to argue that the Court lacks subject matter jurisdiction because Ms. Harris's claims are barred by sovereign immunity.

Ms. Harris filed a response in opposition to WMATA's motion but did not file a statement of material facts or any exhibits.  WMATA's motion is now ripe for decision.

## II.    Legal Standards

### A.    Motion to Dismiss for Lack of Subject Matter Jurisdiction

The Court must dismiss any claim over which it lacks subject matter jurisdiction. Auster v. Ghana Airways Ltd., 514 F.3d 44, 48 (D.C. Cir. 2008).  On a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the plaintiff bears the burden of establishing jurisdiction.  Knapp Med. Ctr. v. Hargan, 875 F.3d 1125, 1128 (D.C. Cir. 2017).  The Court must "accept all well-pleaded factual allegations as true and draw all reasonable inferences from those allegations in the plaintiff's favor," but need not "assume the truth of legal conclusions" in the complaint.  Williams v. Lew, 819 F.3d 466, 472 (D.C. Cir. 2016) (internal quotation marks omitted).  The Court also "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction."  Jerome Stevens Pharm., Inc. v. FDA, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

The Court lacks subject matter jurisdiction over any claim that is barred by sovereign immunity.  See Burkhart v. WMATA, 112 F.3d 1207, 1216 (D.C. Cir. 1997).  The governments

of Maryland, Virginia, and the District of Columbia, with congressional blessing, created

WMATA to provide a regional transportation system for the D.C. metropolitan area.  In doing

so, the states expressly conferred their own Eleventh Amendment sovereign immunity upon

WMATA.  See Watters v. WMATA, 295 F.3d 36, 39 (D.C. Cir. 2002).  Accordingly, "unless

WMATA's sovereign immunity has been waived, [a] district court lacks jurisdiction to enter a

judgment against" it.  Id. at 39-40.

The WMATA Compact expressly waives sovereign immunity over WMATA's "torts and

those of its Directors, officers, employees and agent committed in the conduct of any proprietary

function" but retains immunity "for any torts occurring in the performance of a governmental

function."  D.C. Code § 9-1107.01(80).  Thus, when considering whether WMATA is immune

from suit, the Court must determine whether the challenged actions are proprietary or

governmental.  That question "is one of federal law."  Burkhart, 112 F.3d at 1216 (citation

omitted).

The D.C. Circuit has "developed two alternative tests for identifying 'governmental'

functions under the WMATA Compact."  Id.  First, the Court must ask whether "an activity is a

quintessential governmental function, such as police activity.'"  Id. (cleaned up).  If the activity

is quintessentially governmental, "it is within the scope of WMATA's sovereign immunity."  Id.

If not, "immunity will depend on whether the activity is 'discretionary' or 'ministerial,' a

dichotomy employed by the Federal Tort Claims Act."  Id. (citation omitted).  In this second-

level inquiry, "[o]nly those activities considered 'discretionary' are shielded by sovereign

immunity."  Id.

"Generally speaking, a duty is discretionary if it involves judgment, planning, or policy

decisions.  It is not discretionary [i.e., ministerial] if it involves enforcement or administration of

a mandatory duty at the *operational level*, even if professional expert evaluation is required."

KiSKA Constr. Corp. v. WMATA, 321 F.3d 1151, 1159 n.9 (D.C. Cir. 2003) (emphasis in original) (citation omitted).  In contexts where a function is governed by some statute, regulation, or policy, the Court asks whether that statute, regulation, or policy "specifically prescribes a course of action for an employee to follow," or whether it leaves some choice to the employee. Id. at 1159 (citation omitted).  If the employee's action is specifically prescribed, the function is ministerial.  If the employee retains some choice, the court proceeds to ask *what kind* of choice the employee must make.  If the employee's decisionmaking is "grounded in social, economic, or political goals," the activity is discretionary. Id. (internal quotation marks omitted).  By contrast, if the employee's implementation of the statute, regulation, or policy involves only day-to-day decisionmaking with no connection to social, economic, or political goals, the function is ministerial, and sovereign immunity does not apply. See Whiteru v. WMATA, 258 F. Supp. 3d 175, 185-86 (D.D.C. 2017); WMATA v. O'Neill, 633 A.2d 834, 839 (D.C. 1993).

A similar analysis applies in contexts where there is no statute, regulation, or policy for a WMATA employee to apply.  Sovereign immunity protects WMATA from being "second-guessed by a jury" when it makes "quasi-legislative policy decisions" in the absence of statutory, regulatory, or written policy guidance. McKethean v. WMATA, 588 A.2d 708, 714 (D.C. 1991).  However, sovereign immunity does not apply if WMATA, in its capacity as a transit company, breaches a mandatory duty under applicable tort law to take (or refrain from taking) some action that does not implicate WMATA's discretion to weigh social, economic, and political interests. See Gillot v. WMATA, 507 F. Supp. 454, 457 (D.D.C. 1981) (holding that WMATA, like any other parking lot owner, may be sued in tort "for failure to provide a safe place to park"); see

also Whiteru, 258 F. Supp. 3d at 185 ("[T]he non-existence of a policy that governs a particular agency function . . . does not necessarily mean that WMATA enjoys sovereign immunity.").

    B.  Motion for Summary Judgment

    In addition to seeking dismissal for lack of jurisdiction, WMATA moves to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), or alternatively, for summary judgment under Rule 56.  A motion under Rule 12(b)(6) that relies on materials outside the pleadings must be treated as a motion for summary judgment.  Fed. R. Civ. P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").  When the Court treats a motion to dismiss as one for summary judgment, it must give all parties "a reasonable opportunity to present all the material that is pertinent to the motion."  Id.  Here, WMATA's motion relies heavily on attached exhibits.  Ms. Harris had the opportunity to respond to the evidence attached to WMATA's motion and present any other pertinent material.  She also had an opportunity to—but did not—seek pre-summary judgment discovery by filing an affidavit declaring that she could not "present facts essential to justify [her] opposition."  Fed. R. Civ. P. 56(d).  Therefore, to the extent WMATA asks for dismissal under Rule 12(b)(6), the Court will construe that request as a motion for summary judgment.

    The Court will grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is "genuine" only when a reasonable fact-finder could find for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And a

fact is "material" only if it can affect the outcome of the case.  Id.   Non-material factual disputes will not prevent the Court from granting summary judgment.  Id.

In considering a motion for summary judgment, the Court "must view the evidence in the light most favorable to the opposing party." Tolan v. Cotton, 572 U.S. 650, 657 (2014) (internal quotation marks omitted).  The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and identifying portions of the record that it believes "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has carried this initial burden, the party opposing summary judgment must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" Jeffries v. Barr, 965 F.3d 843, 859 (D.C. Cir. 2020) (quoting Anderson, 477 U.S. at 256). If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).  "[M]ere allegation or denial," alone, is insufficient to defeat summary judgment.  Jeffries, 965 F.3d at 859 (quoting Anderson, 477 U.S. at 256).  Moreover, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to defeat a motion for summary judgment.  Anderson, 477 U.S. at 252. "[T]here must be evidence on which the jury could reasonably find for" the nonmoving party. Id.

C.  Negligence

"D.C. law applies to this case because the Court sits in the District of Columbia and the [alleged tort] occurred here." Evans v. WMATA, 816 F. Supp. 2d 27, 31 n.2 (D.D.C. 2011). Under D.C. law, the elements of negligence are "(1) a duty of care owed by the defendant to the

plaintiff, (2) a breach of that duty by the defendant, and (3) damage to the plaintiff, proximately caused by the breach of duty." Powell v. District of Columbia, 634 A.2d 403, 406 (D.C. 1993).

The requirement of proximate cause "has two components: 'cause-in-fact' and a 'policy element' which limits a defendant's liability when the chain of events leading to the plaintiff's injury is unforeseeable or 'highly extraordinary in retrospect.'" District of Columbia v. Carlson, 793 A.2d 1285, 1288 (D.C. 2002) (quoting Lacy v. District of Columbia, 424 A.2d 317, 320-21 (D.C. 1980)). When, as here, "an injury is caused by the intervening criminal act of a third party," proximate cause "depends upon a more heightened showing of foreseeability than would be required if the act were merely negligent." Potts v. District of Columbia, 697 A.2d 1249, 1252 (D.C. 1997) (internal quotation marks omitted). Precisely *how* foreseeable the intervening crime must be to satisfy proximate cause may vary depending on the nature of the relationship between the plaintiff and the defendant. See Bd. of Trs. of Univ. of D.C. v. DiSalvo, 974 A.2d 868, 872 (D.C. 2009) (suggesting a "sliding scale" approach "whereby a relationship entailing a greater duty of protection may require a lesser showing of foreseeability"). However, even when the defendant has a special duty to protect the plaintiff, proximate cause requires at least some showing of circumstances that would give the defendant "an increased awareness of the danger of a *particular* criminal act," as opposed to criminal activity in general. District of Columbia v. Doe, 524 A.2d 30, 33 (D.C. 1987) (emphasis added).[3]

---

[3] The parties in Doe had a school-pupil relationship. Id. at 32. The standard of foreseeability applicable to a school-pupil relationship is informative as to the standard for comparable types of special relationships, such as the relationship between a common carrier and its passengers and the relationship between a landowner and its business invitees. See Novak v. Capital Mgmt. and Dev. Corp., 452 F.3d 902, 913-14 (D.C. Cir. 2006) (analogizing dance club's duty to protect invitees from third-party crimes to the duties of schools and common carriers); Restatement (Second) of Torts § 314A ("similar" duties of protection apply to a common carrier, an innkeeper, a "possessor of land who holds it open to the public," and a person who "takes the

### III.  Analysis

Ms. Harris claims that WMATA could have prevented Mr. Ferrell's death had it acted reasonably and followed its own policies throughout the night of April 28, 2019.  Her claims, as pled in the amended complaint and explained in her memorandum opposing WMATA's motion, can be distilled into five theories of liability.  <u>First</u>, she claims the bus driver had a duty to prevent the escalation of the argument Mr. Ferrell had with his assailants on the bus and to protect Mr. Ferrell after hearing purported threats against him.  <u>Second</u>, she claims that WMATA negligently failed to warn Mr. Ferrell that the Metro station was closed when he boarded the escalator.  <u>Third</u>, she contends that WMATA failed, contrary to its own policies, to visually inspect the station for customers or monitor the station's security equipment properly, which delayed its response to the attack.  <u>Fourth</u>, she claims more generally that WMATA failed to provide "adequate security" at the Potomac Avenue Metro Station despite "a lengthy history of criminal activity" at the station and nearby.  <u>Fifth</u>, she claims WMATA—through the station agent who appeared on the video—was negligent in its response after the attack, including its alleged failure to provide first aid or summon timely medical assistance.  The Court will discuss each of these claims in turn.

### A.  <u>Bus Driver's Failure to Protect Mr. Ferrell</u>

The amended complaint does not make entirely clear what duty to Mr. Ferrell, if any, Ms. Harris accuses the WMATA bus driver of breaching.  However, in opposition to WMATA's motion, Ms. Harris argues that "WMATA's bus driver did nothing to address the behavior of any of the passengers; nor, did she address the threats made against Jamal Ferrell."  Opp. 3, ECF No.

---

custody of another under circumstances such as to deprive the other of his normal opportunities for protection").

19.  In particular, Ms. Harris argues that when the bus driver heard Male #1's threat to put Mr. Ferrell "to sleep," the driver should have alerted the police so that "officers could have been sent to keep the peace or render aid if necessary." Id. at 14.  Ms. Harris "believe[s]" that the bus driver's inaction was "in direct conflict with WMATA SSOPs" but argues that "[d]iscovery is needed to determine if this is so." Id. at 3.

Ms. Harris's claim regarding the bus driver fails because the record cannot support a conclusion that Mr. Ferrell's homicide became foreseeable to the driver during the time Mr. Ferrell spent on the bus.  The driver's actions and omissions while Mr. Ferrell was on the bus therefore cannot have proximately caused his death.

The Court begins this proximate-cause analysis by limiting its focus to Mr. Ferrell's time on the bus, because that is the only time when the driver owed him a duty of protection from third-party crimes.  "[W]here a special relationship exists, such as between a common carrier and its passengers, the carrier undeniably has a duty to protect its passengers from foreseeable harm arising from criminal conduct of others." O'Neill, 633 A.2d at 840 (citing Restatement (Second) of Torts § 314A(1)(a)).  But "[a] common carrier has no special duty to non-passengers." McKethean, 588 A.2d at 712.  Mr. Ferrell became a non-passenger when he stepped off the bus and onto a non-WMATA-owned sidewalk, even if he intended to enter a WMATA Metro station soon thereafter. See id.  Thus, if WMATA is liable for the bus driver's failure to protect Mr. Ferrell, that liability must relate to some action the driver should have taken while Mr. Ferrell was a passenger on the bus.  Therefore, the relevant question as to proximate cause is whether Mr. Ferrell's homicide became foreseeable to the driver while he was a bus passenger.  It is irrelevant, for example, whether the crime became foreseeable when Male #1 said "I'll put your

dumb ass to sleep out here, shorty"—a statement made *after* Mr. Ferrell left the bus.[4]  Similarly immaterial is the deposition testimony Ms. Harris proposes to take from unnamed witnesses who were standing outside the bus and purportedly "could corroborate the allegation that there was a verbal altercation on the bus which spilled onto the street."  Opp. 3.

The issue of whether the bus driver could have foreseen Mr. Ferrell's stabbing while he was on the bus would normally be "a question of fact for the jury."  Wilson v. WMATA, 912 A.2d 1186, 1190 (D.C. 2006) (citation omitted).  However, the Court may find proximate cause lacking as a matter of law if no reasonable juror could reach the opposite conclusion.  Id.  For example, in Gillot, the court granted summary judgment against a plaintiff who was abducted and raped by a man she encountered in a WMATA parking lot.  507 F. Supp. at 456.  The court found as a matter of law that WMATA did not proximately cause the harm to the plaintiff because the record would not support a conclusion that WMATA "realized or should have realized the likelihood that a third person might avail himself of the opportunity to commit a crime."  Id. at 457; see also Ellis v. Safeway Stores, Inc., 410 A.2d 1381, 1382 (D.C. 1979) (holding as a matter of law that "[a]lthough both parties agree that the neighborhood in question is in a high crime area, there was no way [the defendant grocery store] could know in advance of the particular attack in question.").

---

[4] Even if the driver owed a duty to Mr. Ferrell at that time, the Court would still find that Male #1's statement did not make the homicide foreseeable.  Perhaps a jury could believe that the bus driver heard Male #1 and should have understood him to be referring to Mr. Ferrell and threatening to kill him.  But this statement could not have made it foreseeable that someone *other than* Male #1 would later kill Mr. Ferrell, which the security footage from the Metro station shows is what happened.  The bus driver's actions and omissions after Mr. Ferrell left the bus therefore could not have proximately caused Mr. Ferrell's death.  If anything, the driver's course of action—promptly driving the bus away from Mr. Ferrell, with Male #1 aboard—*protected* Mr. Ferrell from Male #1, the only person who even arguably posed a foreseeable risk to Mr. Ferrell's safety.

On the record before the Court, no reasonable juror could conclude that the events while Mr. Ferrell was on the bus made the particular crime at issue—Mr. Ferrell's homicide by Male #2—foreseeable to the driver.  To begin, no one would reasonably infer that Mr. Ferrell's homicide was foreseeable from the mere fact that he was engaged in an argument on the bus. Many courts, including the D.C. Court of Appeals, have recognized that a verbal altercation alone is insufficient as a matter of law to make it foreseeable that physical violence will follow. See Ellis, 410 A.2d at 1382 (attack was unforeseeable although it followed an argument between the plaintiff and the attacker, which was heard by a store security guard); Warwick v. Accessible Space, Inc., 448 P.3d 206, 213 (Wyo. 2019); Stoner v. Montpelier Tavern Co., 98 N.E.3d 1092, 1103 (Ohio Ct. App. 2017); Dailey v. Albertson's, Inc., 83 S.W.3d 222, 228-29 (Tex. Ct. App. 2002); Sanzo v. Solvay Union Free Sch. Dist., 750 N.Y.S.2d 252, 253 (N.Y. App. Div. 2002).

Ms. Harris argues that the evidence here shows more than a mere argument:  "The video also captures audio of threats of bodily harm directed toward Jamal Ferrell."  Opp. 11.  Indeed, as Mr. Ferrell moves toward the bus's front exit, the security video captures Male #2 saying something like, "You better keep on moving, shorty, if you don't want the shit kicked out of you, shorty.  I'll [inaudible] the shit out of his dumb ass."  This threat might make it foreseeable that *if* Mr. Ferrell failed to "keep on moving," *then* Male #2 would physically hurt him.  But Mr. Ferrell did keep moving toward the front of the bus, then left through the front exit while Male #2 used the rear exit.  Once Mr. Ferrell had complied with the demand to "keep on moving," it was objectively reasonable for the bus driver to expect Mr. Ferrell and Male #2 to go their separate ways.  Nothing in the record suggests that the driver should have drawn any other inference.  In the absence of specific evidence that violence may be imminent, WMATA bus drivers need not—and should not—disrupt regular bus service by intervening in every argument that could

*conceivably* escalate into something more serious.  Nor would it make sense for WMATA to inundate the police with calls about every threat uttered on a bus, no matter how petty and idle the threat seems.[5]

Ms. Harris's generic assertion that there was a "heightened amount of criminal activity" near the Potomac Avenue Metro Station, Opp. 6, likewise fails to support a reasonable inference that Mr. Ferrell's homicide was foreseeable to the bus driver.  Proximate cause requires a showing that the *particular* crime that harmed the plaintiff was foreseeable, not merely that the area is prone to crimes of a general type.  See Ellis, 410 A.2d at 1382 (specific attack was unforeseeable "[a]lthough both parties agree that the neighborhood in question is in a high crime area").  At most, the existence of a general pattern of criminal activity near the station is a "mere . . . scintilla of evidence" supporting Ms. Harris's position that Mr. Ferrell's homicide was foreseeable.  Anderson, 477 U.S. at 252.

In arguing that WMATA is liable for the bus driver's alleged negligence, Ms. Harris relies on O'Neill, 633 A.2d 834.  Opp. 15.  There, two apparently intoxicated men boarded a WMATA bus that the plaintiff was riding and engaged in threatening behavior for ten minutes or

---

[5] Ms. Harris also suggests that while on the bus, Mr. Ferrell might have been subjected to other threats that the security video does not clearly capture.  Ms. Harris wants to develop the record by having the recording "analyzed" to filter out noise and "'clean up' the sound."  Opp. 2.  If Ms. Harris believed she needed more time for audio analysis to support her opposition to the summary judgment motion, she should have raised that point in an affidavit under Rule 56(d), not solely in her opposition brief.  Even if Ms. Harris's opposition brief is construed to double as a Rule 56(d) affidavit, it does not meet the requirements to avoid summary judgment under that rule.  A successful Rule 56(d) affidavit must (1) "outline the particular facts [the party opposing summary judgment] intends to discover and describe why those facts are necessary to the litigation"; (2) "explain why he could not produce the facts in opposition to the motion for summary judgment"; and (3) "show the information is in fact discoverable."  Convertino v. DOJ, 684 F.3d 93, 99-100 (D.C. Cir. 2012) (cleaned up).  But Ms. Harris has failed to "explain why" she could not have had the audio analyzed in the month between WMATA's motion and her response.  Id. at 99.

more.  O'Neill, 633 A.2d at 835-36.  The plaintiff and another passenger asked the bus driver to

intervene, but the driver refused.  Id. at 836.  One of the men grabbed the plaintiff, explicitly

threatened to kill him, and pointed a finger in his face.  The other man then struck the plaintiff in

the face, causing severe injuries.  Id.  "On these facts," the D.C. Court of Appeals held that

reasonable jurors could find that the plaintiff's beating was foreseeable to the driver.  Id. at 840.

However, O'Neill does not expose WMATA to liability for every assault that occurs

following a disturbance on a WMATA bus.  In Milone v. WMATA, the plaintiff encountered an

unusually noisy group of passengers on a bus, and one of those passengers eventually punched

the plaintiff.  91 F.3d 229, 230 (D.C. Cir. 1996).  The D.C. Circuit found insufficient evidence to

sustain a finding that the assault was foreseeable to WMATA.  Id. at 232.  As the court

explained, the facts in Milone differed from O'Neill in several key respects, including that no

one asked the bus driver to intervene and that the noisy passengers did not "walk up and down

the bus aisle intimidating or threatening other passengers."  Id.

Like Milone, this case is a far cry from O'Neill.  There is no evidence that anyone laid a

hand on Mr. Ferrell or physically menaced him while he was on the bus.  Nor does it appear that

anyone asked the bus driver to take any corrective action.  Mr. Ferrell merely had a verbal

altercation with his fellow passengers for about one minute—a far more routine and less ominous

occurrence than the ten minutes of threatening behavior that preceded the attack in O'Neill.  Cf.

Milone, 91 F.3d at 231 (citing trial testimony that "loudness on a bus is a common everyday

occurrence").

Because the evidence cannot support a conclusion that the bus driver's omissions

proximately caused Mr. Ferrell's death, the Court will grant summary judgment for WMATA on

Mr. Harris's claim regarding the driver.

B.  Failure to Warn that the Metro Station was Closed

As already noted, Mr. Ferrell was unable to seek shelter from his attacker in the passenger area of the Metro station because the station was closed and its gates were down.  Ms. Harris contends that Mr. Ferrell did not know the station was closed when he boarded the down escalator, and that WMATA should have warned him of that fact.  Specifically, she faults WMATA for leaving the station's escalator running after closing the gate to the underground entrance, which she "believe[s]" to be a violation of WMATA's procedures.  Opp. 4, 7.  She also notes that the escalator's lights were on.  Opp. 8.  According to Ms. Harris, the operating, lighted escalator gave the false impression that the station was open and thus served as "the final piece of the trap that lead to the death of Jamal Ferrell."  Id.

Like the claim regarding the bus driver, this claim must be rejected for lack of proximate causation.  While Ms. Harris alleges that the station and its surrounding area have a history of crime that makes further criminal activity foreseeable, Am. Compl. ¶ 16, it is not enough to establish that WMATA could have foreseen some incidence of violence at the station.  Again, Ms. Harris's burden is to show that WMATA had, or should have had, "an increased awareness of the danger of [the] *particular* criminal act" that caused Mr. Ferrell's death.  Doe, 524 A.2d at 33 (emphasis added); see also Ellis, 410 A.2d at 1382.  Nothing in the record suggests that WMATA was on heightened notice of any danger that the failure to shut off the escalator after closing time would become part of a chain of events culminating in a homicide.  While not dispositive, see Doe, 524 A.2d at 33, it is noteworthy that Ms. Harris does not cite any example of a similar crime, either in the D.C. area or elsewhere, that would have put WMATA on notice.

As a matter of law, it was not foreseeable that WMATA's failure to shut down the escalator or otherwise warn the public that the station was closed would lead to the particular

crime that killed Mr. Ferrell.  The Court will therefore grant summary judgment for WMATA on this claim.

    C.  <u>Failure to Monitor Security Equipment and Visually Inspect Station</u>

Next, Ms. Harris contends that WMATA failed to take certain steps to monitor activity at the Metro station so that the attack on Mr. Ferrell could be promptly detected.  She alleges that WMATA violated its own SSOPs "by failing to visually inspect the station areas and cameras to ensure that no customers/invitees were present" and "by failing to monitor the security cameras and video equipment to ensure the safety of passengers and invitees to the station."  Am. Compl. ¶ 23.

To begin, the unrebutted record disproves the allegation that WMATA failed to "visually inspect" the Metro station.  Security footage from the station shows that at 11:43 p.m.—less than three minutes after Mr. Ferrell first appeared on the escalator—a uniformed WMATA station agent approached the scene of the fight and inspected the area.  After leaving the frame, she returned for another inspection about a minute later.  Assuming the station agent was required to adhere to some routine for periodic visual inspection, nothing in the amended complaint or in the record suggests that she violated that requirement by failing to inspect the escalator area of the station *even sooner* than three minutes after Mr. Ferrell first arrived.

Similarly, the evidence before the Court shows that WMATA had no policy requiring each of its security cameras to be monitored in real time, either through automated behavioral analytics or by an employee personally watching the live video without interruption.  WMATA offers undisputed evidence that, although it once installed a behavioral analytics system meant to detect certain anomalies that could be seen on security cameras, it abandoned that system over a year before Mr. Ferrell's homicide.  <u>See</u> Def.'s Statement of Material Facts ¶¶ 15-17; Doody

Decl. ¶¶ 17-19.  Moreover, the record shows that WMATA has "thousands" of security cameras throughout its system (including 34 in the Potomac Avenue Metro Station alone) and considers it "impossib[le]" to live-monitor every camera with the limited staff of the MTPD's Digital Video Evidence Unit ("DVEU").  Doody Decl. ¶ 16.  Ms. Harris argues that she needs an opportunity to depose the DVEU employees who worked the night of Mr. Ferrell's death "to ascertain what their duties were and if the WMATA SSOPs indicated that they were to monitor the camera system in lieu of the analytics system that was discontinued."  Opp. 6.  But WMATA has submitted evidence that its employees had no such responsibility, Doody Decl. ¶ 16, and Ms. Harris cannot rebut this evidence simply by suggesting in an opposition brief that discovery *might* prove the opposite.[6]

If WMATA were an ordinary defendant, then perhaps Ms. Harris could argue that its failure to adopt a policy of monitoring each security camera in real time is itself a negligent choice, and that WMATA might have saved Mr. Ferrell's life had it used live monitoring to discover the fight slightly earlier.  However, to the extent Ms. Harris makes this argument, it is barred by WMATA's sovereign immunity.  Whether to adopt behavioral analytic technology and whether to hire employees to live-monitor every WMATA security camera are policy choices that implicate the size of WMATA's budget, its spending priorities within that budget, and even

---

[6] "In the interests of fairness," the Court has discretion to consider arguments for allowing discovery that were made in an opposition brief, even though such arguments technically should have been raised in a Rule 56(d) affidavit.  Swann v. Office of Architect of Capitol, 74 F. Supp. 3d 20, 28 (D.D.C. 2014) (Cooper, J.).  But in this case, fairness does not require the Court to bend the procedural rules so that Ms. Harris may depose the DVEU employees, on the off chance that those depositions might reveal a policy of live-monitoring every security camera.  Given WMATA's uncontested assertion that it has thousands of security cameras, it borders on the implausible that WMATA could expect DVEU employees to monitor every camera in real time around the clock.

the balance it strikes between protecting passengers' safety and respecting their privacy.  These decisions involve "the exercise of political, social, or economic judgment" and are thus shielded by sovereign immunity.  Burkhart, 112 F.3d at 1217 (holding that "the hiring, training, and supervision of WMATA personnel are governmental functions"); see also Sanguesa v. WMATA, CIV. A. No. 89-3475, 1990 WL 141772, at *5 (D.D.C. Sept. 20, 1990) (claim that "WMATA failed to assure . . . the constant monitoring by [station managers] of the television security monitor or otherwise patrolling the station" barred by sovereign immunity).

For these reasons, WMATA is entitled to summary judgment on the claims that it failed to visually inspect the Metro station and live-monitor its security cameras.  Insofar as Ms. Harris challenges WMATA's failure to adopt policies requiring live video monitoring, that claim will also be dismissed for lack of subject matter jurisdiction based on sovereign immunity.

D.  Failure to Provide "Adequate Security" at the Metro Station

Ms. Harris claims that WMATA "had a duty to provide adequate security" at the Potomac Avenue Metro Station "in light of crimes that had been committed on or near the premises," and that WMATA failed to fulfill this duty.  Am. Compl. ¶¶ 21-22.  Although the amended complaint is less than perfectly clear, this claim appears to be distinct from Ms. Harris's more specific claims that WMATA failed to warn Mr. Ferrell that the station was closed, visually inspect the station, and monitor its security cameras.  The "adequate security" Ms. Harris has in mind presumably would involve assigning more security personnel to the station or taking other, unspecified measures to improve the station's overall security.

This claim is barred by sovereign immunity.  To the extent Ms. Harris argues that the Metro station should have been staffed by police officers or functionally similar security personnel, that claim is squarely foreclosed because policing is a quintessentially governmental

function.  See Dant v. District of Columbia, 829 F.2d 69, 74 (D.C. Cir. 1987).  Even if Ms.

Harris's inadequate-security claim is not (exclusively) about WMATA's police function, it still

fails on sovereign immunity grounds.  To be sure, WMATA is not automatically immune from

any tort claim involving the protection of passengers from violence.  See O'Neill, 633 A.2d at

839 (holding WMATA liable for negligent implementation of an internal safety policy).  But

here, Ms. Harris points to no specific statute, regulation, or policy that WMATA allegedly

violated in providing less than "adequate security."[7]  Instead, Ms. Harris seems to challenge

WMATA's choice not to instruct its employees to implement greater security at the Potomac

Avenue Metro Station specifically.  Her claim thus relates to policy choices about "the type and

level of security employed by WMATA."  Sanguesa, 1990 WL 141772, at *5.  These policy

matters implicate "discretionary decisionmaking," id., and doubtless involve consideration of

social, economic, and political factors.  WMATA's exercise of such discretion is shielded by

sovereign immunity.  Ms. Harris's inadequate-security claim therefore must be dismissed.

    E.  Station Agent's Failure to Help Mr. Ferrell After Seeing Him Injured

      Finally, Ms. Harris contends that WMATA breached its duty to provide first aid or other

assistance to Mr. Ferrell after it knew or had reason to know that he was injured in the Metro

station.  Am. Compl. ¶¶ 24-25; Opp. 13-14.  To determine whether this claim should proceed,

---

[7] Ms. Harris alleges in her amended complaint that WMATA failed "to comply with
WMATA established security policies, security measures, and security procedures," Am. Compl.
¶ 23(d), but she does not cite or describe any specific "security policies" that WMATA allegedly
violated.  The Court need not accept this conclusory and unsupported allegation that such
"policies" exist.  See Felder v. WMATA, 105 F. Supp. 3d 52, 59 (D.D.C. 2015) (dismissing
claims where "the plaintiff alleged no facts to suggest, beyond the plaintiff's own speculation,
that WMATA had policies and procedures in place"); cf. Rowe v. District of Columbia, 892 F.
Supp. 2d 174, 181 (D.D.C. 2012) (in suit alleging a municipal policy that violates civil rights,
plaintiff must do more than allege the existence of "an unspecified policy, custom or practice"
(cleaned up)).

the Court must consider: (1) whether, viewing the record in the light most favorable to Ms.

Harris, WMATA owed Mr. Ferrell a duty after finding him injured; (2) whether a reasonable

juror could find that the station agent breached that duty and thus proximately caused Mr.

Ferrell's death; and (3) whether this claim falls within WMATA's waiver of sovereign

immunity.  The Court answers all three questions in the affirmative and therefore will decline to

dismiss or grant summary judgment on this claim.

> *1.   Did WMATA owe a duty to Mr. Ferrell while he was in the Metro station?*

WMATA argues that it owed no duty to Mr. Ferrell because the Metro station was

closed, and Mr. Ferrell was therefore a trespasser when he boarded the escalator.  Def.'s Mem. 9,

ECF No. 13-1.  A genuine dispute of material fact precludes summary judgment on this issue.

"[I]n the District of Columbia a landowner owes a duty of reasonable care to all persons,

including both invitees and licensees, who are lawfully on the landowner's premises," but

"generally does not owe a duty of reasonable care to trespassers."  Boyrie v. E&G Property

Servs., 58 A.3d 475, 477 (D.C. 2013).  A trespasser generally may recover only for "intentional,

wanton, or willful injury or the maintenance of a hidden engine of destruction."  Id. (citation

omitted).

A trespasser is any "person who enters or remains upon land in the possession of another

without a privilege to do so created by the possessor's consent or otherwise."  Id. at 477-78

(internal quotation marks omitted).  "Authorization to enter property can be express or implied."

Id. at 478.  Thus, even if the landowner does not knowingly consent to a person's entry, the

person may have a legal invitation to enter the land based on "appearances which would justify a

reasonable person in believing that such landowner (or occupant) had given his consent to the

entry of the particular person or of the public generally."  Id. (quoting Firfer v. United States,

208 F.2d 524, 527 (D.C. Cir. 1953)).[8]

The unrebutted evidence shows that the Metro station had been closed for approximately

forty minutes when Mr. Ferrell boarded the escalator.  However, Ms. Harris argues that Mr.

Ferrell reasonably believed the station was open, based on objective indications he would have

observed at the time.  As the security video shows, the station's escalators were operating when

Mr. Ferrell arrived at the station.  According to Ms. Harris, a regular WMATA patron would

"recognize that the station was open if the escalators are on and moving passengers toward the

entrance."  Opp. 10.  She also contends that the hours of operation are not posted outside the

Metro station, id., and that a person viewing the escalator from street level would not be able to

see that the gate to the station's underground entrance was closed, id. at 16.  WMATA does not

contest these assertions and nothing in the record suggests otherwise.

On these facts, a reasonable juror could determine that Mr. Ferrell had implied

authorization to enter the Metro station, based on objective "appearances which would justify a

reasonable person in believing that" WMATA consented to his entry.  Boyrie, 58 A.3d at 478.

The issue of whether a person had implied authorization to enter a place of business after closing

time is typically an appropriate question for the jury.  See Winn-Dixie Montgomery, Inc. v.

Rowell, 288 So.2d 785, 789 (Ala. Civ. App. 1973) ("The evidence was in conflict as to whether

or not the [defendant's] store was open for business and whether or not plaintiff was invited to

---

[8] Traditionally, such a person would be classified as a "licensee by invitation"—a category technically distinct from "bare licensees" and "invitees."  Id.  However, licensees by invitation "were treated like invitees."  Toomer v. William C. Smith & Co., Inc., 112 A.3d 324, 328 n.8 (D.C. 2015).  Under modern D.C. law, landowners owe a single duty to all lawfully present persons: the duty of reasonable care.  Boyrie, 58 A.3d at 477.

come on its premises.  The question of whether a person is or is not an invitee is factual and in a

jury trial devolves upon the jury for determination.").

Because a reasonable juror could conclude that Mr. Ferrell was lawfully present at the

Metro station, the Court cannot hold as a matter of law that WMATA owed Mr. Ferrell no duty.[9]

Like any land possessor, WMATA owes a duty of reasonable care to its licensees and invitees.

Boyrie, 58 A.3d at 477-78.  Indeed, WMATA may have owed a *special* duty to Mr. Ferrell based

on his status as a patron who relied on outward indications that the station was open to the

public.  Although a defendant generally owes no affirmative duty to help a plaintiff whom the

defendant has not injured, see Restatement (Second) of Torts § 314, land possessors who hold

their property open to the public do have a duty to provide first aid or summon medical help for

injured and ill persons who entered the land in response to the invitation.  Id. § 314A; see also

Whiteru, 258 F. Supp. 3d at 192 n.11 (applying D.C. law and noting that common carriers have a

duty to provide first aid to ill and injured passengers); O'Neill, 633 A.2d at 840 (citing § 314A

with approval).  In short, proprietors like WMATA owe a duty of first aid to their injured

invitees, and a jury could find that Mr. Ferrell was an invitee within the meaning of that rule.[10]

---

[9] In reaching this conclusion, the Court expresses no opinion on whether there was a common carrier-passenger relationship between WMATA and Mr. Ferrell at the Metro station. To become a passenger, a person must "place[] himself in some substantial sense in the custody or under the control of the carrier." McKethean, 588 A.2d at 712 (citation omitted).  None of the cases cited by the parties definitively resolve whether a person who boards a WMATA-owned escalator to enter a Metro station has placed himself substantially in WMATA's custody.  But see Le v. Target Stores, Inc., No. 1:18-cv-520, 2019 WL 441968, at *1 (E.D. Va. Jan. 18, 2019) (treating an escalator itself as a common carrier under Virginia law).

[10] The Court is cognizant that, in a strict sense, "D.C. tort law no longer distinguishes between types of licensees or between licensees and invitees." Toomer, 112 A.3d at 328 n.8.  But modern D.C. law does appear to recognize a special relationship, entailing special obligations, between a proprietor and persons who enter land in response to the proprietor's public invitation.

     2.   *Did the station agent negligently cause Mr. Ferrell's death by failing to provide or summon medical help?*

Proceeding on the premise that WMATA owed Mr. Ferrell a duty of first aid, the Court finds that, based on the facts currently before the Court, a reasonable juror could conclude that the station agent breached this duty, and that this breach proximately caused Mr. Ferrell's death.

Viewed in the light most favorable to Ms. Harris, the record shows that Mr. Ferrell was attacked at 11:40 p.m., suffered multiple stab wounds, collapsed on the up escalator at 11:41, and was later found dead at the top of the escalator. See Boehm Decl. ¶ 16. The record does not reveal the time of death. The security footage also shows the station agent examining the scene from inside the station gate, first at 11:43 and again at 11:44. The fact that the station agent inspected the area, walked away, then quickly returned for another inspection could suggest that the station agent noticed something amiss and may have tried to gather more information in the interval between the two inspections. A reasonable juror could thus conclude that at some point between Mr. Ferrell's stabbing and his death, the station agent saw him in an injured state, either with the naked eye or, not implausibly, on a video monitor inside the station showing live footage of the top of the escalator.

At the same time, the current record does not conclusively prove that the station agent called for medical help or attempted to provide first aid herself. There is evidence that someone alerted MTPD of Mr. Ferrell's assault at approximately 11:42, Boehm Decl. ¶ 16, but it is unclear that the tip came from the station agent. If the station agent did call MTPD, that action *might* satisfy her duty to seek medical help for Mr. Ferrell—but only if, after making the call, the station agent reasonably expected that MTPD would promptly respond with competent medical

---

See Novak, 452 F.3d at 913. That latter category of persons may be referred to as "invitees," if only as a convenient shorthand. See id.

help.  The evidence submitted so far does not show what (if anything) the station agent told the police about Mr. Ferrell's urgent need for medical help, nor does it establish what the station agent knew or should have known about MTPD's capabilities as a provider of emergency medical care.  Thus, assuming the station agent did call the police, there are genuinely disputed facts relevant to whether that call satisfied WMATA's duty to Mr. Ferrell.

If the station agent did fail to provide or seek medical help for Mr. Ferrell, a reasonable juror could conclude, depending on when exactly Mr. Ferrell may have expired, that this failure proximately caused Mr. Ferrell's death.  It appears from the security footage that by 11:41, Mr. Ferrell was so obviously hurt that he could not stand.  Moreover, the evidence that Mr. Ferrell suffered multiple stab wounds supports an inference that he was visibly bleeding.  It is hardly unforeseeable that a person who has collapsed or is heavily bleeding on a Metro escalator might perish without medical assistance.  Nor can the Court conclude as a matter of law that the chain of causation between the station agent's alleged inaction and Mr. Ferrell's death was broken when MTPD received a call at 11:42.  The evidence at trial might (or might not) show that if the station agent had made a separate call for emergency medical help, the dispatcher would have sent a medical response team that arrived sooner than the MTPD, was better-equipped to help Mr. Ferrell, or both.  If so, the jury could reasonably believe that the station agent's alleged failure to make that call proximately caused Mr. Ferrell to be deprived of life-saving treatment.

In short, there are genuine disputes of material fact as to whether WMATA's station agent failed to provide first aid or call for medical help after learning that Mr. Ferrell was injured, and whether that failure proximately caused Mr. Ferrell's death.

*3. Does sovereign immunity bar the claim regarding the station agent?*

The Court must, of course, dismiss the claim regarding the station agent if it is barred by sovereign immunity. However, the Court is not persuaded that WMATA is immune from liability for failure to provide first aid or other medical assistance.

As a threshold matter, providing or summoning medical help for an injured invitee is not a "quintessential[] governmental function." Burkhart, 112 F.3d at 1216 (citation omitted). On the contrary, it is a common-law duty shared by private and governmental landowners who hold their property open to the public. Restatement (Second) of Torts § 314A. WMATA does not discuss the governmental or proprietary nature of this specific duty, but argues broadly that Ms. Harris's complaint alleges "failures to prevent criminal activity" and thus amounts to "a challenge to WMATA's police function," which is quintessentially governmental. Def.'s Mem. 7. As a general matter, this statement of WMATA's sovereign immunity is somewhat overbroad; WMATA seems to suggest that any failure to protect passengers from third-party crimes is automatically a police matter, which is not the case. O'Neill, 633 A.2d at 839. More to the point, this argument is inapposite to WMATA's alleged failure to provide medical help upon finding Mr. Ferrell injured. That claim challenges WMATA's response *after* the criminal attack on Mr. Ferrell, not WMATA's failure to prevent the attack beforehand.

Because WMATA's alleged conduct is not quintessentially governmental, the sovereign immunity issue comes down to whether the conduct is "discretionary" or "ministerial." Burkhart, 112 F.3d at 1216. The parties have cited no specific statute, regulation, or policy that

directly governs WMATA employees' provision of first aid. [11]   For purposes of the present motion to dismiss, therefore, the Court need not analyze the effect of any statute, regulation, or policy on WMATA station managers' discretion.

"[T]he non-existence of a policy that governs a particular agency function . . . does not necessarily mean that WMATA enjoys sovereign immunity."  Whiteru, 258 F. Supp. 3d at 185. In its proprietary capacity as a transit company, WMATA may be held liable for breaching a common-law duty that dictates how any proprietor must act under the circumstances.  See Gillot, 507 F. Supp. at 457; Dant, 829 F.2d at 74-75 (sovereign immunity did not bar a tort claim alleging that WMATA negligently operated and maintained its fare card system).  However, this principle does not allow plaintiffs to challenge "quasi-legislative" policy and planning decisions by WMATA and its employees.  McKethean, 588 A.2d at 714.

The duty to provide medical help to Mr. Ferrell fits into the category of ministerial, proprietary functions that WMATA may be sued for allegedly failing to perform.  Offering first aid to injured invitees is not a policy choice that WMATA may decide against, but a duty that all proprietors owe their invitees.  See Restatement (Second) of Torts § 314A; Whiteru, 258 F. Supp. 3d at 192 n.11.

It may well be the case that WMATA's employees have some discretion to decide how to fulfill this duty in a given situation.  But "[t]he fact that in a particular case a [WMATA employee] might have alternative courses of action from which to choose and this choice might involve a certain degree of judgment, does not elevate the [employee's] decision to the level of

---

[11] Ms. Harris alleges that WMATA "fail[ed] to render aid as required by WMATA SSOPs," but cites no specific WMATA SSOP that purportedly governs the station agent's actions. Am. Compl. ¶ 23(g).

'basic policy.'" O'Neill, 633 A.2d at 839 (quoting Lopez v. S. Cal. Rapid Transit Dist., 710 P.2d 907, 916 (Cal. 1985)); accord Whiteru, 258 F. Supp. 3d at 187.  For example, in O'Neill, the court recognized that WMATA bus drivers must exercise judgment in deciding how to respond to unruly passengers, but it noted that this discretion was not "unbridled."  633 A.2d at 838.  "At a minimum, unless this would exacerbate the situation, they are instructed to order disruptive passengers to leave the bus if they do not stop the abusive conduct."  Id. at 839.  That constraint on the bus drivers' discretion brought the function at issue within WMATA's waiver of sovereign immunity.  Id.  Similarly, in Whiteru, the court acknowledged that WMATA's station managers might have some discretion to determine which areas of the station required a walk-through inspection for sleeping customers.  258 F. Supp. 3d at 186.  But it was "clear that any such discretionary determination is grounded in WMATA's mandatory walk-through directive, and not the particular manager's own 'social, economic, or political' goals."  Id. (citation omitted).

So too here.  After (allegedly) finding Mr. Ferrell injured, the station agent at the Potomac Avenue Metro Station might have been free to choose between personally administering first aid and calling for emergency medical assistance.  But WMATA's common-law duty toward injured invitees, like the policies implicated in O'Neill and Whiteru, provided a non-discretionary minimum:  WMATA *had to* provide emergency medical help somehow.  Nothing in the record or in WMATA's motion papers suggests that employees' operational decisionmaking about how to provide first aid is grounded in social, economic, or political goals.  Indeed, when a severely injured patron needs immediate medical help, these abstract policy matters should be the farthest things from a WMATA employee's mind.

In sum, if Mr. Ferrell was an invitee whom the station agent knew to be injured—as a reasonable juror could believe based on the present record—then WMATA had a proprietary, ministerial duty to provide or summon first aid.  The Court therefore declines to dismiss this claim for lack of jurisdiction.[12]

## IV.   Prejudgment Interest

Finally, WMATA challenges Ms. Harris's request for prejudgment interest as a part of her damages, arguing that WMATA is immune from liability for such interest.  Ms. Harris has not responded to this argument.

Whether the Court *could* award prejudgment interest against WMATA is not obvious.  "The D.C. Circuit has noted that '[i]t remains unclear whether prejudgment interest is available in a negligence action'" under D.C. law.  Romero v. ITW Food Equip. Group LLC, 118 F. Supp. 3d 349, 352 n.2 (D.D.C. 2015) (quoting Williams Enters., Inc. v. Sherman R. Smoot Co., 938 F.2d 230, 238 (D.C. Cir. 1991)).  Moreover, while the WMATA Compact contains no express waiver of sovereign immunity from interest, Kingston Constructors, Inc. v. WMATA, 860 F. Supp. 886, 888 (D.D.C. 1994), WMATA might perhaps be liable for prejudgment interest as part of its liability for proprietary, ministerial acts.  See id. at 889.

---

[12] As noted above, WMATA has also moved to dismiss the amended complaint for failure to state a claim, but the Court treats that motion as one for summary judgment.  However, to the extent WMATA argues that the claim regarding the station agent is insufficiently pled (as opposed to being disproven by the undisputed facts or barred by sovereign immunity), the Court rejects that argument as well.  Ms. Harris alleges that Mr. Ferrell was attacked by "assailants" sometime after 10:45 p.m., and that he died in the Potomac Avenue Metro Station.  Am. Compl. ¶¶ 9, 14.  She further alleges that WMATA has a duty to provide first aid to injured passengers, and that WMATA was negligent in "failing to render or obtain timely and necessary emergency, medical or other assistance, despite actual and/or constructive knowledge of" the attack.  Id. ¶¶ 24-25.  These allegations adequately state a claim for negligent failure to provide first aid.  See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation," but does not require "detailed factual allegations" (citation omitted)).

Putting these questions aside, the Court will exercise its discretion to refrain from awarding prejudgment interest on any damages in this case.  See Romero, 118 F. Supp. 3d at 352-53.  In Romero, the court declined to modify a jury verdict in a products liability case, which awarded damages but did not include prejudgment interest.  As the court observed, the jury was specifically instructed to calculate damages to make the plaintiff whole.  Id. at 354.  The court distinguished that situation from an economic tort case in which "[t]he harm the [counterclaimant] suffered was an economic loss, and it was deprived of a definite amount of money that was certain from the moment the tort occurred."  Id. at 353.  Here, as in Romero, any damages award would be calculated to make Ms. Harris whole (insofar as any amount of money can compensate a parent for the loss of a child).  Assuming WMATA is liable at all, there is no fixed amount of money that WMATA owes Ms. Harris and on which interest should be accruing.

The Court will therefore dismiss Ms. Harris's request for prejudgment interest.

**V.    Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss and for Summary Judgment in part and deny it in part.  A separate Order shall follow.

Date:  September 29, 2020

_____
CHRISTOPHER R. COOPER
United States District Judge