# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PHYLLIS HARRIS**, <br><br> Plaintiff, <br><br> v. <br><br> **WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY**, <br><br> Defendant. | Case No. 20-cv-8 (CRC) |

## MEMORANDUM OPINION

Plaintiff, Phyllis Harris, seeks damages from the Washington Metropolitan Area Transit Authority ("WMATA") for the death of her son, Jamal Ferrell, who was fatally stabbed in 2019 at the Potomac Avenue Metro Station in Southeast Washington, D.C. Ms. Harris initially asserted several theories of negligence liability, but in a prior ruling, the Court narrowed the case to a single issue: whether WMATA is liable for the alleged failure by one of its station managers to summon medical assistance for Mr. Ferrell after the attack. WMATA now moves for summary judgment resolving that issue in its favor.

WMATA has carried its burden to establish that it is entitled to judgment as a matter of law. The record now before the Court shows that, although the station manager saw Ferrell in a physical altercation, she reasonably was unaware that he had been stabbed and was lying at the top of the station escalator in a severely injured state. Upon witnessing the fight, the station manager promptly reported it to the Metro Transit Police Department ("MTPD")—a response sufficient to satisfy any duty she owed to Ferrell. The Court will therefore grant WMATA's motion.

I.  **Background**

   A. Prior Proceedings

Ms. Harris initially filed this action in District of Columbia Superior Court in December 2019, seeking damages for Mr. Ferrell's death under D.C.'s wrongful death and survival statutes. Compl., ECF No. 1-4. WMATA removed the case to this Court in January 2020.

After Harris amended her complaint, WMATA filed a motion to dismiss or for summary judgment in February 2020. ECF No. 13. In considering that motion, the Court had before it a record that, viewed in the light most favorable to Harris, established the following facts.

On the night of April 28, 2019, around 11:35 p.m., Ferrell was traveling on a WMATA bus and got into a verbal altercation with three other passengers: a woman, a man wearing light-colored pants ("Male #1"), and a man wearing dark-colored pants ("Male #2"). Harris v. WMATA, 490 F. Supp. 3d 295, 303-04 (D.D.C. 2020). Ferrell eventually got up from his seat and walked toward the front of the bus. As Ferrell was moving away from the others, the bus's security cameras captured Male #2 saying something along the lines of, "You better keep on moving, shorty, if you don't want the shit kicked out of you, shorty. I'll [inaudible] the shit out of his dumb ass." Id. at 304.

At 11:37, all four passengers left the bus and appeared to engage with each other briefly on the sidewalk. Male #1 then returned to the bus and said, "I'll put your dumb ass to sleep out here, shorty," or something similar. The bus then pulled away. Id.

Ferrell was next captured on camera at 11:40:38, when he arrived at the Potomac Avenue Metro Station, which is owned and operated by WMATA. Although the station was closed, its three escalators were operating. The left escalator led down into the station, while the other two led up. Id.

As Ferrell was descending on the left escalator, a man—apparently Male #2—appeared to kick him. Ferrell tumbled to the bottom of the escalator. Because the station was closed, the gates to the platform were down, and Ferrell could not flee into the passenger area of the station. Id.

A second camera positioned inside the station captured a fight between Ferrell and his assailant at the bottom of the escalators. The two men exchanged punches as Ferrell was backed against a wall. The camera then recorded the assailant appearing to stab Mr. Ferrell several times, pushing him onto the ascending escalator on the right, and possibly stabbing him again. Id.

At 11:41, another individual—possibly the woman from the bus—arrived and travelled down the left escalator. This person then travelled up the middle escalator with the assailant. Meanwhile, a visibly injured Ferrell rode the right escalator, prone but still moving. About halfway up, his movements appeared to cease, and the escalator carried him off screen. Id. Ferrell ultimately died of his injuries. Id. at 305.[1]

According to a declaration submitted by MTPD Captain Stephen M. Boehm, MTPD received a radio call at "approximately 11:42 p.m." about "a reported assault at Potomac Avenue Metro Station." Id. at 304 (citing First Boehm Decl. ¶ 16, ECF No. 13-3). MTPD responded and found a man who fit Ferrell's description unresponsive and without a pulse at the top of the escalator. Id. The record before the Court on WMATA's February 2020 motion did not reflect

---

[1] Although not reflected in the record before the Court, publicly available records show that Xavier Culbreth was prosecuted for Ferrell's death and pled guilty to voluntary manslaughter while armed with a knife. See Judgment, United States v. Culbreth, No. 2019 CF1 8412 (D.C. Super. Ct. June 14, 2021). Jada Smith was also charged in connection with the incident; she pled guilty to second-degree theft. See Judgment, United States v. Smith, No. 2019 CF1 7699 (D.C. Super. Ct. Apr. 21, 2021).

who called the police, what information the caller conveyed, or what time MTPD arrived at the station. Id. at 304-05.

At 11:43, a WMATA station manager appeared on camera inside the Metro station. She walked toward the scene and looked around from inside the gate. The manager exited the frame, then returned about a minute later and took a closer look. Id. at 305.

On this record, the Court granted summary judgment to WMATA on most of Harris's claims but found genuine disputes of material fact as to one issue: whether WMATA was liable for its station manager's alleged failure to provide emergency medical assistance to Ferrell after the attack. Id. at 303. In the absence of evidence to the contrary, the Court explained, "[a] reasonable juror could . . . conclude that at some point between Mr. Ferrell's stabbing and his death, the station [manager] saw him in an injured state," thus triggering a legal duty to provide or summon first aid. Id. at 316-17. Moreover, the evidence before the Court did not "conclusively prove that the station [manager] called for medical help or attempted to provide first aid herself." Id. at 317. As the Court noted, it was "unclear" whether the station manager had called MTPD, and even assuming she did, there were open factual questions as to whether she "reasonably expected that MTPD would promptly respond with competent medical help." Id.

B. Present Motion for Summary Judgment

In October 2020, one month after the Court's initial ruling, WMATA filed the present motion seeking summary judgment on Ms. Harris's sole remaining theory of liability. Mot. for Summ. J., ECF No. 25. In support of this motion, WMATA submitted a declaration from Patricia Johnson, the station manager seen on the security video; another declaration from MTPD Acting Deputy Chief Stephen Boehm; a recording of a telephone call between Ms. Johnson and

4

MTPD; and a longer recording of the MTPD dispatcher's conversations with officers in the hour after the attack. These submissions reveal the following new, undisputed facts about the events of April 28, 2019.

Johnson was situated near the Potomac Avenue Station's kiosk when she "observed what appeared to be three individuals engaged in a physical altercation outside the Metro station gates." Johnson Decl. ¶ 5, ECF No. 25-3. During the fight, Johnson used the station's intercom system to warn the combatants that she was calling MTPD, hoping to "scare the individuals away to break up the altercation." Id. ¶ 6.

While speaking on the intercom, Johnson also called MTPD on the kiosk phone. Id. ¶ 7.[2] As the recording of the call reflects, Johnson told MTPD that there was an ongoing assault, and the individuals involved were "still here." When asked for details about the individuals and the incident, Johnson said she saw a Black male punched by another person. She also said that she had not seen any weapons and did not know if any were present. At the end of the call, Johnson was asked whether the individuals "went to topside" (i.e., exited the station via the ascending escalator), and she said that they did. At the time, according to her declaration, Johnson did not know that anyone had collapsed on the escalator and was lying at the top, nor had she seen anyone bleeding. Johnson Decl. ¶ 11-12. She was not able to see the top of the escalator from inside the station, either with the naked eye or on a video monitor. Id. ¶ 10-12.

At 11:43 p.m., an MTPD dispatcher made a call requesting that officers respond to the incident. The dispatcher did not immediately request medics. However, all MTPD officers

---

[2] The undisputed record shows that the timestamps on WMATA's audio recordings accurately reflect the times when calls occurred. Second Boehm Decl. ¶ 7, ECF No. 25-4.

5

receive first responder training and can "triage injuries and administer emergency first aid to the injured until medics arrive." Second Boehm Decl. ¶ 11.

According to the nearly hour-long recording of the dispatcher's conversations, an MTPD cruiser arrived at Potomac Avenue Metro Station by 11:48 p.m. The first-responding MTPD officer called the dispatcher from the scene, requesting medics and reporting that there was a "subject down on the escalator" who was unresponsive. Shortly thereafter, the officer stated that the incident was "looking like a stabbing." He added, "Get these medics here quick. I'm trying to free him, he's stuck in the escalator. . . . I'm solo, trying to get a pulse."

At 11:51 p.m., another officer on the call said that he had a trauma kit in his car and would be at the Potomac Avenue station in ten minutes. But a minute later, the officer at the scene reported that the victim had no pulse. By 12:01 a.m. on April 29, an ambulance had arrived, and medics were "working on" Ferrell, according to the MTPD first responder.

At some point after placing the initial call to MTPD, Johnson left the station and saw what she describes as MTPD officers "actively working on" Ferrell. Johnson Decl. ¶ 14. Until that time, she did not know that Ferrell had been stabbed. Id.

Harris filed a memorandum opposing the present motion but did not file a statement of disputed material facts as required by Local Civil Rule 7(h)(1) or an affidavit seeking to show a need for discovery under Federal Rule of Civil Procedure 56(d). WMATA filed a reply, and the motion is now ripe for consideration.

## II. Legal Standard

The Court will grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only when a reasonable fact-finder could

find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). And a fact is "material" only if it can affect the outcome of the case. Id. Non-material factual disputes will not prevent the Court from granting summary judgment. Id.

In considering a motion for summary judgment, the Court "must view the evidence in the light most favorable to the opposing party." Tolan v. Cotton, 572 U.S. 650, 657 (2014) (internal quotation marks omitted). The moving party "bears the initial responsibility of informing the district court of the basis for its motion" and identifying portions of the record that it believes "demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has carried this initial burden, the party opposing summary judgment must then "come forward with 'specific facts showing that there is a genuine issue for trial.'" Jeffries v. Barr, 965 F.3d 843, 859 (D.C. Cir. 2020) (quoting Anderson, 477 U.S. at 256). If the nonmoving party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e). "[M]ere allegation or denial," alone, is insufficient to defeat summary judgment. Jeffries, 965 F.3d at 859 (quoting Anderson, 477 U.S. at 256). Similarly, "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to defeat a motion for summary judgment. Anderson, 477 U.S. at 252. "[T]here must be evidence on which the jury could reasonably find for" the nonmoving party. Id.

### III. Analysis

WMATA argues that, based on the undisputed facts, the station manager responded reasonably to the fight in the Metro station and therefore WMATA is not liable for Ferrell's death. After a close review of the record, the Court agrees.

7

As an initial matter, the facts set out in WMATA's Statement of Material Facts, ECF No. 25-2, are not genuinely disputed. Each material fact is supported by appropriate evidence in the record. Harris also failed (for the second time) to file a statement of disputed material facts as required by Local Civil Rule 7(h)(1). That failure alone is sufficient to render the facts in WMATA's statement undisputed. See Burke v. Gould, 286 F.3d 513, 518 (D.C. Cir. 2002) (district court does not abuse its discretion by treating the movant's statement of facts as conceded where the opposing party fails to file a counterstatement as required by local rule); Harris, 490 F. Supp. 3d at 303 n.1 (noting Harris's prior failure to file a responsive statement of facts).

Harris suggests in her opposition brief that some of the facts proffered by WMATA are false, but she fails to offer evidence to sustain any genuine dispute. Harris argues that Johnson's affidavit is "contradicted" by the security videos in the record and by the audio recording of Johnson's call to MTPD, Opp'n at 1, 6, ECF No. 29, but she does not show any specific contradictions between the affidavit and the recordings, let alone any that implicate material factual issues. Similarly, Harris points to a series of photographs of the Potomac Avenue Metro Station attached to her opposition brief, asserting that these images contradict Johnson's affidavit. Id. at 6 (citing Pl. Exh. 1, ECF No. 29-1). According to Harris, these publicly available photographs show that "[t]he seating position in the kiosk" of the station "faces the escalators with an unobstructed view." Id. However, assuming these unauthenticated photographs are proper materials for the Court's consideration, they offer, at most, some evidence that Johnson *could* have seen Ferrell prone on the escalator if she had looked in the right direction at the right moment. Such evidence does not undercut Johnson's sworn

attestation that she "*did not* see any of the individuals who were fighting collapsed on the up escalator." Johnson Decl. ¶ 11 (emphasis added).[3]

Insofar as Harris's opposition brief argues that she needs discovery to test the accuracy of WMATA's Statement of Material Facts, she should have presented this argument in a separate affidavit. See Fed. R. Civ. P. 56(d) (nonmoving party may avoid summary judgment if it "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition"). Harris was well aware of this obligation. See Harris, 490 F. Supp. 3d at 311 n.5 (noting Harris's failure to file a Rule 56(d) affidavit in prior round of dispositive briefing). In any event, the opposition brief does not explain how Harris's proposed discovery could negate any of the factual propositions in WMATA's Statement of Material Facts. As discussed further below, the thrust of Harris's argument is that she needs discovery on factual issues *other than* those addressed by WMATA. Thus, the Court will accept the facts asserted in WMATA's Statement of Material Facts and analyze whether those facts establish WMATA's entitlement to judgment as a matter of law.

"D.C. law applies to this case because the Court sits in the District of Columbia and the [alleged tort] occurred here." Evans v. WMATA, 816 F. Supp. 2d 27, 31 n.2 (D.D.C. 2011). Under D.C. law, the elements of negligence are "(1) a duty of care owed by the defendant to the

---

[3] Nor is this attestation somehow implausible. On the contrary, the record tends to show that it would have been difficult, if not impossible, for Johnson to observe Ferrell's physical position on the escalator. On security footage that appears to be shot from roughly the vantage point of the kiosk, the image of Ferrell ascending on the escalator is faint and distant. Moreover, during the few seconds after Ferrell collapsed on the escalator but before the escalator carried him too far up to be visible from the kiosk, Johnson was likely on the phone with MTPD and therefore less than fully focused on watching Ferrell's every move.

plaintiff, (2) a breach of that duty by the defendant, and (3) damage to the plaintiff, proximately caused by the breach of duty." Powell v. District of Columbia, 634 A.2d 403, 406 (D.C. 1993).

Here, the central question is one of duty—specifically, whether WMATA owed Ferrell a duty to do anything more than it did to provide medical help. Generally, a defendant owes no affirmative duty to help a plaintiff whom the defendant has not injured. See Restatement (Second) of Torts § 314. However, a "possessor of land who holds it open to the public" does have a duty "to take reasonable action . . . to give . . . first aid after [the land possessor] knows or has reason to know" that "members of the public who enter[ed] in response to his invitation" are "ill or injured, and to care for them until they can be cared for by others." Id. § 314A; see also Harris, 490 F. Supp. 3d at 316; WMATA v. O'Neill, 633 A.2d 834, 840 (D.C. 1993) (citing § 314A with approval). This duty never requires proprietors "to take any action beyond that which is reasonable under the circumstances" and only "seldom" requires them "to do more than give such first aid as [the proprietor] reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained." Restatement (Second) of Torts § 314A cmt f; see also Lundy v. Adamar of N.J., Inc., 34 F.3d 1173, 1179 (3d Cir. 1994) ("[T]he duty recognized in § 314A does not extend to providing all medical care that the [proprietor] could reasonably foresee might be needed by a patron."). The specific steps that qualify as reasonable will depend in part on how much the proprietor knows, or reasonably should know, about the invitee's medical condition. Compare, e.g., Brennan v. River Park Motel & Suites, Inc., No. 1–09–3455, 2011 WL 10069356, at *1-2, *6 (Ill. App. Ct. Mar. 31, 2011) (where motel guest collapsed and may have been bleeding but was alert enough to converse with motel manager and refused offer of an ambulance, manager acted reasonably by carrying guest to her room, assigning housekeeper to stay with guest

10

temporarily, and handing guest over to her boyfriend, although guest's condition later worsened and led to death) with Noon v. Carnival Corp., No. 18-23181-CIV, 2019 WL 3886517, at *4 (S.D. Fla. Aug. 12, 2019) (where cruise crewmembers allegedly "had knowledge that [a passenger] was in respiratory distress," they "arguably had a duty to notify, obtain, or seek medical care" for the passenger).

In this case, one could argue that once Johnson witnessed what she perceived as Ferrell being punched in the Metro station, her duty to take reasonable action to provide or summon medical care was triggered. However, based on the facts established by the record, no reasonable juror could conclude that Johnson failed to satisfy this duty. Mere seconds after the fight starting, and while it was still in progress, Johnson attempted to warn the assailants off by threatening to call MTPD. She simultaneously reported the incident to MTPD. While Johnson did not explicitly ask MTPD to send medical help, there was no need for her to do so, because *all* MTPD officers receive first responder training and can "triage injuries and administer emergency first aid to the injured until medics arrive." Second Boehm Decl. ¶ 11. Indeed, that is precisely how MTPD responded to the attack on Ferrell. Within minutes of Johnson's call, an MTPD officer was at the scene, working to free Ferrell from the escalator, trying to find his pulse, and requesting that medics be dispatched quickly. By 12:01 a.m., approximately 20 minutes after the stabbing, an ambulance had arrived, and Ferrell was receiving professional medical attention. These facts underscore the reasonableness of Johnson's heat-of-the-moment judgment that calling MTPD would be an effective way to secure prompt medical care for whatever injuries Ferrell might sustain in the ongoing altercation.[4]

---

[4] As Harris notes, Opp'n at 7, there is evidence that the first MTPD officer to arrive on the scene did not have a trauma kit. Therefore, Harris argues, this officer "did not have adequate

In hindsight, the evidence shows that Ferrell was not merely punched but repeatedly stabbed, wounding him so gravely that he could not stand on the escalator. Importantly, however, Johnson did not know until she exited the station that any weapons had been involved in the attack or that Ferrell had collapsed. Johnson Decl. ¶ 14; see also Second Boehm Decl. Exh. 1 (recording of emergency call in which Johnson told MTPD that she saw no weapons). Nor does anything in the record suggest that Johnson *should have* known these facts. Viewed from a distance, the stabbing motions by Ferrell's assailant would have looked almost indistinguishable from punches.[5] And as already noted, Johnson could see only the bottom part of the escalator from inside the station and therefore had little opportunity to observe Ferrell's physical position on the escalator. See Johnson Decl. ¶ 10.

Accordingly, the issue in this case is not how a station manager should respond to a known stabbing. Rather, the question is whether an apparent fistfight, without more, obligates WMATA to take any steps to secure medical help beyond calling MTPD, such as directly calling for an ambulance. As a matter of law, it does not. Cf. Reason v. Kathryn's Korner Thrift Shop, 169 A.3d 96, 105-06 (Pa. Super. Ct. 2017) (holding, in case concerning fistfight at defendant's store, that "a business satisfies its duty to aid a business invitee" under Pennsylvania law "by calling 911 or another source of professional medical or police assistance"). Otherwise,

---

equipment to effectively assist Mr. Ferrell." Id. But WMATA's duty to provide or summon first aid "does not extend to providing all medical care that [WMATA] could reasonably foresee might be needed by a patron." Lundy, 34 F.3d at 1179. Even if Johnson knew or should have known that MTPD's first responder would arrive without a trauma kit, it still would have been perfectly reasonable for her to turn to MTPD to "look after [Ferrell] and see that medical assistance [was] obtained." Restatement (Second) of Torts § 314A cmt. f.

[5] Video footage shot from near the station kiosk, viewed in the light most favorable to Harris, is suggestive of a stabbing. However, it is not easy to discern from the video whether Ferrell was punched or stabbed, even with the benefit of repeated viewing.

12

proprietors throughout the District of Columbia would have an incentive to overreact to minor scuffles on their premises, burdening local emergency medical services with unnecessary requests and reducing the availability of those services where they are needed most.

As already noted, Harris has not filed an affidavit under Rule 56(d) but argues in her opposition brief that the Court should provide an opportunity for discovery on several issues before entering summary judgment. Assuming for argument's sake that Harris's brief could be construed as a Rule 56(d) affidavit, it would still fail. A successful Rule 56(d) affidavit must (1) "outline the particular facts [the party opposing summary judgment] intends to discover and describe why those facts are necessary to the litigation"; (2) "explain why he could not produce the facts in opposition to the motion for summary judgment"; and (3) "show the information is in fact discoverable." Convertino v. Dep't of Justice, 684 F.3d 93, 99-100 (D.C. Cir. 2012) (cleaned up). Harris has not carried this burden as to any category of potential discovery.

Harris emphasizes that she has not obtained discovery on WMATA's "procedure manuals or protocol materials that would identify the required procedures for all WMATA employees who witness any violence or altercations by or upon members of the public while located on WMATA property," including any applicable Station Standard Operating Procedures ("SSOPs"). Opp'n at 2; see also id. at 7-9. However, Harris does not "explain why" she could not have obtained copies of the relevant SSOPs or other WMATA policy documents outside the formal discovery process. Convertino, 684 F.3d at 99 (internal quotation marks omitted). As an attachment to Harris's own opposition brief shows, at least one past requester was able to obtain partial copies of WMATA SSOPs and handbooks through WMATA's Public Access to Records Policy ("PARP"). Pl. Exh. 2 at 2-3, ECF No. 29-2; see also Reply at 13, ECF No. 30 (noting that

13

the PARP "is patterned after the federal Freedom of Information Act"). Harris does not mention having filed a PARP request or offer any reason why doing so would have been futile.[6]

More fundamentally, Harris also fails to show that information about WMATA's internal policies is "necessary to the litigation." Convertino, 684 F.3d at 99. Harris argues that Johnson was "required to comply with the protocols and directives of WMATA – not merely the expected behavior of a 'reasonable person.'" Opp'n at 2. Thus, under Harris's theory, WMATA could be liable if Johnson violated internal policies that, if followed, would have led her to discover Ferrell's injuries sooner or take additional steps to provide medical help. However, "[t]he D.C. Court of Appeals has held that such internal policies—standing alone—cannot demonstrate the applicable standard of care." Briggs v. WMATA, 481 F.3d 839, 848 (D.C. Cir. 2007) (citing Clark v. District of Columbia, 708 A.2d 632, 636-37 (D.C. 1997)). WMATA's SSOPs and similar documents "may be 'admissible as *bearing on the* standard of care,'" but "admission at trial of the WMATA manuals alone would be insufficient" to establish what duty WMATA owed Ferrell. Id. (quoting Clark, 708 A.2d at 636) (emphasis in original). Given the absence of other evidence that Johnson acted negligently, WMATA's written policies would not affect the outcome of this case, even assuming that policies applicable to the situation exist and that Johnson violated them.

---

[6] The Court does not mean to suggest that the potential availability of WMATA's written policies through the PARP would have precluded Harris from obtaining those policies through discovery if this case had proceeded to the discovery stage. Many documents are both discoverable in litigation and accessible through open-records statutes. See U.S. Dep't of Justice v. Julian, 486 U.S. 1, 14 (1988) (holding that certain documents must be released under the Freedom of Information Act *because* those documents would have been routinely discoverable in other litigation). However, a party seeking to avoid summary judgment under Rule 56(d) must show not only that the information she seeks is discoverable, but also that she "*could not* produce the facts" without first obtaining discovery. Convertino, 684 F.3d at 99 (emphasis added).

The other areas of discovery that Harris seeks to pursue are similarly immaterial. Harris asks for an opportunity to depose the police officers whose voices are heard on the recording submitted by WMATA "to ascertain if they followed the designated protocols and procedures in compliance with WMATA policy." Opp'n at 8. But as just explained, Harris cannot wield WMATA's internal policies against it to show negligence where the record otherwise suggests none. And to the extent that Harris posits a theory of liability based on MTPD's actions or omissions, that claim would be doomed because policing "is a quintessential governmental function" for which WMATA enjoys sovereign immunity. Burkhart v. WMATA, 112 F.3d 1207, 1216 (D.C. Cir. 1997) (cleaned up).

Harris also suggests that she needs to depose the police officers to probe what she describes as "missing portions of the audio" where "communication was edited or removed" without explanation. Opp'n at 3. However, the contention that WMATA's audio recordings have been edited or tampered with is baseless. Deputy Chief Boehm attests that the recordings are "fair and accurate duplicates of the April 28, 2019 dispatch and emergency calls," Second Boehm Decl. ¶ 4, and nothing in the record suggests otherwise. Contrary to Harris's argument, Opp'n at 9, there is nothing "strange[]" about the wordless portions of the dispatch call, which obviously indicate pauses in the conversation.

Next, Harris seeks discovery focused on the causation element of negligence. See Opp'n at 6 ("Without discovery, it is unknown if the time that passed between his collapse at 11:41 and him receiving medical aid from DC EMS that responded to the scene could have saved Mr. Ferrell's life."); id. at 7 (proposing discovery as to whether the first responder's failure to bring a trauma kit caused Ferrell to lose a chance at survival). This discovery is not material because the record establishes that WMATA satisfied its duty to Ferrell. WMATA therefore would not be

liable even if Harris could somehow prove that the few minutes that elapsed between Johnson witnessing the fight (approximately 11:41 p.m.) and the first-responding MTPD officer calling for medics (11:48 p.m.) caused Ferrell's death.

Finally, Harris suggests discovery on whether any WMATA personnel other than Johnson "had access to the video system that monitors the activity in and around the Potomac Ave station." Opp'n at 5. However, she offers no support for the speculation that other WMATA employees might have viewed the incident on video monitors. Moreover, the Court previously granted summary judgment for WMATA on the claim that it negligently failed to monitor its security cameras in real time, Harris, 490 F. Supp. 3d at 312-14, and Harris offers no basis to reconsider that ruling.

The personal loss that led Harris to file this lawsuit is unquestionably painful. Yet, the undisputed facts before the Court demonstrate that WMATA is not legally responsible for this tragedy.

## IV. Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion for Summary Judgment. A separate Order shall accompany this memorandum opinion.

Date: June 21, 2021

CHRISTOPHER R. COOPER
United States District Judge